## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

CHRISTOPHER BEAL,         :
                             :

      Plaintiff,         :
                             :

   v.                :      **CASE NO: 7:19-cv-155 (WLS)**
                             :
JIMMY MILES, *et al.,*     :
                             :

      Defendants.     :

## ORDER

Before the Court is the Recommendation (Doc. 329) filed August 13, 2022, by United States Magistrate Judge Thomas Q. Langstaff. Therein, Judge Langstaff recommends that the Court grant the Defendant Avery Moody's Motion for Summary Judgment (Doc. 316) ("Moody's MSJ"). Judge Langstaff's Recommendation provided the parties with fourteen days to file an objection. (Doc. 329 at 9.) By Order (Doc. 343) entered August 30, 2022, Plaintiff was given an additional fourteen days from the date of the Order, or until September 13, 2022, in which to file objections to the Recommendation. Plaintiff's "Objections to the Court's Order and Recommendations in (Doc. 329)" (Doc. 349) ("Objection") was timely filed effective September 11, 2022.[1]

For the reasons that follow, Judge Langstaff's Recommendation (Doc. 329) is **ACCEPTED** and **ADOPTED**.

## I.   PROCEDURAL BACKGROUND

On September 12, 2019, Plaintiff, proceeding *pro se*,[2] filed this action pursuant to 42 U.S.C. § 1983 ("*Beal I*"), alleging violations of his rights during the time he was an inmate at

---

[1] "Under the 'prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing. Absent evidence to the contrary, we assume that the prisoner's filing was delivered to prison authorities the day he signed it." *Daker v. Comm'r, Georgia Dep't of Corr.*, 820 F.3d 1278, 1286 (11th Cir. 2016) (alteration adopted) (internal quotations omitted) (citations omitted). Plaintiff's Objection was signed by Plaintiff on September 11, 2022 (Doc. 349 at 18) and docketed September 19, 2022.

[2] Because Plaintiff is proceeding *pro se*, his pleadings are liberally construed. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam).

Valdosta State Prison ("VSP"). Plaintiff filed two additional cases in this Court, based on the same operative facts: Case No. 7:20-CV-42, filed March 10, 2020, captioned *Beal v. Georgia Department of Corrections*, et *al.*, (M.D. Ga.) ("*Beal II*"), and Case No. 7:20-CV-146 filed July 28, 2020, captioned *Beal v. Hall, et al.*, (M.D. Ga.) ("*Beal III*"). Some of the parties and substantial portions of the allegations in the three cases are duplicative and intertwined. Thus, the cases were consolidated to conserve judicial resources and allow for the efficient and consistent resolution of Plaintiff's claims.[3]

Before and after consolidation of the cases, the Court reviewed Plaintiff's complaints and a myriad of amended complaints and determined that Plaintiff's claims for violations of his Eighth Amendment rights against Avery Moody, Medical Director at VSP ("Dr. Moody") should be allowed to proceed on a claim of deliberate indifference to serious medical need.[4]

Plaintiff's allegations against Dr. Moody in *Beal I* were dismissed because Plaintiff failed to exhaust his administrative remedies. *See* Recommendation (Doc. 98 at 8-9) (accepted and adopted by Order Doc. 115). Plaintiff asserts similar claims against Dr. Moody in his recast complaint (*Beal II* Doc. 14) ("*Beal II* Complaint"). In his initial review of the *Beal II* Complaint under 28 U.S.C. § 1915(a)(A), Judge Langstaff found that the dismissal of claims in *Beal I* based on failure to exhaust is not an adjudication on the merits. As *Beal II* was filed after Plaintiff had exhausted his remedies, Judge Langstaff recommended allowing Plaintiff's deliberate indifference to a serious medical need claim be allowed to proceed against Dr. Moody. (*See* Order and Recommendation (*Beal II* Doc. 18 at 11-12) (accepted and adopted by Order (*Beal II* Doc. 39).) Therefore, references to Plaintiff's claims against Dr. Moody are to the *Beal II* Complaint.

---

[3] *See Beal II* Order entered January 27, 2021 (Doc. 39 accepting and adopting Recommendation (Doc. 18)); *Beal III* Order entered January 4, 2021 (Doc. 24, accepting and adopting Recommendation (Doc. 13)). *Beal I* is the lead case, and unless otherwise noted, document citations are to the docket in *Beal I*.

[4] Plaintiff's claims against: (a) Len Gibson,  Deputy Warden of Administration for deliberate indifference to safety; (b) Jennifer Wolters, Corrections Officer for deliberate indifference to safety; and (c) Hillary Coleman, Corrections Officer for deliberate indifference to safety were also allowed to proceed. (*See* Docs. 287, 291.) These defendants have also filed motions for summary judgment which will be addressed by separate orders of the Court. Plaintiff voluntarily dismissed his claim against Cadet William Wilkerson for failure to intervene. (*See* Order Doc. 361.) Plaintiff's claims against: (a) Captain Jimmy Miles for excessive force; (b) LeeAnna Smith, Unit Manager for failure to intervene and deliberate indifference to safety; (c) Mark Pack for excessive force; and (d) Sgt. Hunter Hall for excessive force were also allowed to proceed and are pending before the Court. (*See* Docs. 287, 291.)

Plaintiff's claims that Dr. Moody acted with deliberate indifference to Plaintiff's serious medical needs arise from two instances in which Plaintiff sustained injuries to his face and left eye when he was attacked by inmates at VSP. Those attacks occurred on March 13, 2019 and April 22, 2019, and are described in detail, *infra*, Part III.A-B. With respect to the March 13, 2019 attack, Plaintiff was seen on March 14, 2019, at South Georgia Eye Partners ("SGEP") by Jodie S. Norman, O.D. Plaintiff relies on Dr. Norman's medical report ("SGEP March 14, 2019 Report") and alleges that Dr. Norman recommended that Plaintiff have a CT scan and that he have a follow up visit within a week. Plaintiff alleges that Dr. Moody acted with deliberate indifference because Dr. Moody did not timely schedule that CT scan or the follow up visit. (*Beal II* Compl. 4.) With respect to the April 22, 2019 attack, Plaintiff was seen on April 24, 2019, at SGEP by James Webster, M.D. Plaintiff relies on Dr. Webster's medical report ("SGEP April 24, 2019 Report") and alleges Dr. Webster recommended Plaintiff be seen by a plastic surgeon within two weeks of the April 24, 2019 visit. Plaintiff alleges that Dr. Moody acted with deliberate indifference to Plaintiff's medical needs when Dr. Moody did not refer Plaintiff to a plastic surgeon until May 15, 2019. (*Beal II* Compl. 3, 7-8.)

## II.   STANDARD OF REVIEW

### A.  District Court's Review of Recommendation as to Dispositive Motions

With respect to dispositive motions, "a [district] judge may . . . designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court. . . ." 28 U.S.C. § 636(b)(1)(B). A judge of the district court shall make a *de novo* determination of those portions of the recommendation to which an objection is made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. If no timely objection is filed, the court considers the recommendation for clear error. "Most circuits agree that in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006) (alteration adopted) (internal quotation marks omitted) (citation omitted).

To properly object to the Recommendation, Plaintiff is required to provide "written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (internal quotation marks omitted) (citation omitted). "It is critical that the objection be sufficiently specific and not a general objection to the report." *Id.* at 784. "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Shuler v. Okeechobee CI Warden*, 815 F. App'x 457, 458 (11th Cir. 2020) (internal quotations omitted) (citation omitted). Plaintiff's Objection substantially restates his allegations in the *Beal II* Complaint, his testimony in the Beal Deposition, and his response to Moody's MSJ (Doc. 324) ("Response to MSJ). However, at the conclusion of his Objection, Plaintiff sets out three specific objections.

First, Plaintiff objects to his claims against Dr. Moody being characterized as disagreements with Dr. Moody's medical judgment. Plaintiff reiterates that Dr. Moody's delays in following his physicians' recommended treatments injured Plaintiff. Judge Langstaff fully addressed Plaintiff's argument regarding Dr. Moody's alleged delay in providing medical treatment and correctly determined that Plaintiff did not meet his burden of proof because he failed to provide medical evidence showing that Plaintiff suffered a detrimental effect as a result of any such delay.

Next, with respect to Judge Langstaff's finding that Plaintiff did not provide any verified medical records in support of his Response to MSJ, Plaintiff argues that he has not received any documents requested throughout this litigation. He further asserts that he did not receive a copy of his medical records which were attached to Moody's MSJ. Plaintiff contends that he is being prejudiced and denied his due process rights by Dr. Moody's failure to provide the medical records.

Finally, Plaintiff contends that Judge Langstaff addressed only one of Plaintiff's claims against Dr. Moody—that being the claim that Dr. Moody was deliberately indifferent to Plaintiff's serious medical need by allegedly delaying the treatment recommended by Dr. Webster in the SGEP April 24, 2019 Report that Plaintiff be referred to a plastic surgeon within two weeks. Plaintiff contends that Judge Langstaff did not address his second claim that Dr. Moody was deliberately indifferent by allegedly delaying the treatment recommended

by Dr. Norman in the SGEP March 14, 2019 Report that Plaintiff receive a CT scan and a follow up appointment in one week. The Court notes that Plaintiff's allegations as to the March 14, 2019 report are not addressed in the Recommendation and will address that claim below.

### B. Motion for Summary Judgment Standard

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).

Also relevant in this case, is that the *Beal II* Complaint is verified, and, therefore, "serves as the equivalent of an affidavit for purposes of summary judgment." *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (citation omitted). *See also United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc) ("[O]ur cases correctly explain that a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment."). The "affidavit cannot be conclusory" and "must set out facts that would be admissible in evidence." *Id.* at 856-57. Thus, to the extent Plaintiff's statements and allegations are based on personal knowledge or observation, are otherwise admissible evidence, and are not conclusory in nature, they are appropriate for the Court's consideration in resolving Moody's MSJ.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### C.  42 U.S.C. § 1983

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII; *McBride v. Rivers*, 170 Fed. App'x 648, 654 (11th Cir. 2006); *see also Robinson v. California*, 370 U.S. 660, 675 (1962) (holding that the Eighth Amendment's ban on cruel and unusual punishments is made applicable to the states by virtue of the Fourteenth Amendment's Due Process Clause).

To state a claim for relief under § 1983, a plaintiff must allege that (1) an act or omission deprived him of a right, privilege, or immunity secured by the Constitution or a statute of the United States; and (2) the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cnty*, 50 F.3d 1579, 1582 (11th Cir. 1995). If a litigant cannot satisfy these requirements or fails to provide factual allegations in support of his claim or claims, the complaint is subject to dismissal. *See Chappell v. Rich,* 340 F.3d 1279, 1282–84 (11th Cir. 2003).

Plaintiff claims that Dr. Moody was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A plaintiff must first "set forth evidence of an objectively serious medical need," and must also "prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need." *Id.* In the Eleventh Circuit, "a serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks omitted) (citation omitted). In other words, prison officials must both "know of and then disregard an excessive risk to the prisoner." *Dunn v. Martin*, 178 F. App'x 876, 877 (11th Cir. 2006) (per curiam).

"Mere negligence in diagnosing or treating a medical condition, or even medical malpractice, does not state an Eighth Amendment claim of medical mistreatment." *Id.* Moreover, "[w]hether prison officials should have employed additional diagnostic techniques or care is an example of medical judgment and not an appropriate basis for § 1983 liability." *Id.* "[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not "support a claim of cruel and unusual punishment," and "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

Further, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the

detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb RYDC*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

### D. Qualified Immunity

Defendant asserts he is entitled to the protection of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* There are two parts to the qualified immunity analysis: (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct. *Id.* at 232.

The Eleventh Circuit has held that:

> To be eligible for qualified immunity, the official must first establish that he was performing a discretionary function at the time the alleged violation of federal law occurred. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was clearly established at the time he did it.

*Crosby v. Monroe Cnty*, 394 F.3d 1328, 1332 (11th Cir. 2004) (internal quotation marks omitted) (citations omitted). Thus, in the Eleventh Circuit, the Court first determines whether Dr. Moody was engaged in a discretionary function before moving on to determine whether Plaintiff has presented relevant facts that Dr. Moody committed a constitutional violation and that violation was clearly established at the time of Dr. Moody's conduct. "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Id* at 1332 (internal quotations marks omitted) (citation omitted).

### III.   PLAINTIFF'S ALLEGATIONS AND DEPOSITION TESTIMONY

In these consolidated cases, the Plaintiff asserts he received injuries in five incidents that occurred while he was an inmate at VSP. The following two incidents are directly relevant to Plaintiff's allegations against Dr. Moody.

### A.  March 13, 2019 – Plaintiff attacked by three inmates

Plaintiff states that on March 13, 2019, he was attacked by three inmates he believes were members of a gang. During the attack, Plaintiff was stabbed in the eye. (Beal Depo. 24:7—13.)[5] Plaintiff states he did not go to "Medical"[6] the night the attack occurred because he did not want to say anything. (*Id.* at 25:17—19.) Plaintiff did not explain why he did not want to say anything.[7] In any event, Plaintiff testified that the next day (March 14, 2019), his eyeball started bleeding and the "lieutenant" saw his eye and sent him to Medical. He was then rushed to the ophthalmologist. (*Id.* at 25:19—23; *see also Beal II* Compl. 4, 6.) Plaintiff alleges that Ms. Nobles, the manager at the ophthalmologist at Southern Georgia Eye Partner ("SGEP"), advised him that he needed to be placed somewhere safe so that his eye could heal. (*Beal II* Compl. 6; *see also* Doc. 5 at 8 providing Ms. Nobles' name.)

With respect to this attack, Plaintiff alleges that on August 19, 2019, Dr. Moody acted with deliberate indifference to Plaintiff's serious medical need to have the "hole in his left eye" fixed. (*Beal II* Compl. 4.) Plaintiff asserts that Dr. Moody gave him "no medical attention at all" and that such failure interfered with Dr. Norman's course of treatment reflected in the medical records dated March 14, 2019. (*Id.*) Plaintiff contends that per the medical records, he was to be taken for a facial CT scan and was to have a follow-up visit with the doctor within a week of the March 14, 2019 visit with SGEP. (*Id.*) It is not clear why Plaintiff refers to the date August 19, 2019, in the *Beal II* Complaint and other documents filed regarding Moody's

---

[5] Plaintiff's deposition was taken on April 28, 2022 ("Beal Deposition"). A copy of the deposition is attached as Exhibit A to Moody's MSJ (Doc. 316-1). The page numbers in the citations to Beal's Deposition are the deposition page number rather than the CM/ECF page numbers of Exhibit A.

[6] "Medical" refers to the medical unit inside VSP.

[7] In reviewing Plaintiff's Georgia Department of Corrections medical records, the Court notes an entry dated March 14, 2019, stating: "I/M [inmate] claims 'they' were horseplaying & he got hit in the eye, actually both eyes were injured 2 days ago." (Doc. 316-2 at 69.) It is not clear what, if any, effect or significance this potential discrepancy as to how and when Plaintiff's injuries were incurred, might have on these cases.

MSJ, but Plaintiff appears to be alleging that Dr. Moody did not schedule Plaintiff's CT scan until August 19, 2019. Plaintiff asserts Dr. Moody's delay in scheduling the scan and follow up appointment caused Plaintiff to suffer nerve damage, night blindness, pain, and inability to fully see in the sun without translucent glasses. (*Id.*) On returning to VSP on March 14, 2019, Plaintiff testified he was placed in K-2 tier lockdown because of the severity of the incident. (Beal Depo. 26:6—25.)

### B. April 22, 2019 – Plaintiff attacked by inmate

On March 26, 2019, Plaintiff was moved from K-2 tier lockdown to the D-1 dormitory. Plaintiff considered D-1 to be a dangerous location because there were gang-affiliated inmates in the dormitory and Plaintiff is a "civilian," not a gang member. (Beal Depo. 27—30.) Plaintiff filed grievances attempting to be moved to a safer area, but they were rejected. (*Id.* at 28-29.)

Plaintiff testified that on April 22, 2019, he was attacked by a member of the "Bloods" gang while in D-1 dormitory. (*Id.* at 29.) The incident started when the inmate attempted to take Plaintiff's food and Plaintiff refused to give his food to the inmate. (*Id.* at 29:17—20.) The inmate punched Plaintiff in the face and in his left eye which had already been damaged during the March 13, 2019 attack. (*Id.*) Immediately after the incident, Plaintiff was taken to Medical and then to South Georgia Medical Hospital. (*Id.* at 31.) Plaintiff returned to VSP on April 22, 2019. (*Id.* at 32:23—25.) Plaintiff agreed that the April 22, 2019 attack made the injuries from the March 13, 2019 attack worse. (*Id.* at 32:19—22.)

Plaintiff testified that on April 22, 2019, a Dr. Ruiz gave him a "receipt for plastic surgery and to see the ophthalmologist for a second follow up." (*Id.* at 33:15—18.) Plaintiff testified that he was seen by Dr. Moody on April 23, 2019, and was also taken to SGEP on April 23, 2019,[8] where he was told by the ophthalmologist that he needed plastic surgery. (Beal Depo. 33:4—10.) According to Plaintiff, the ophthalmologist also "referred that [he] get a[n] alignment of my eyeball [be]cause it was offline." (*Id.* 33:19—22.) Plaintiff alleges that he was

---

[8] The reports from SGEP are dated April 24, 2019, and the *Beal II* Complaint refers to a visit with the ophthalmologist on April 24, 2019. (*Beal II* Compl. 3.) Dr. Moody's Declaration also shows that Plaintiff saw an ophthalmologist on April 24, 2019. (Decl. ¶ 14.) Therefore, the Court believes that Plaintiff's deposition testimony that he was seen at SGEP on April 23, 2019, is likely an inadvertent misstatement.

supposed to see a plastic surgeon within two weeks of his visit with the ophthalmologist on April 24, 2019. (*Beal II* Compl. 3.)

On May 15, 2019, Dr. Moody sent Plaintiff to a plastic surgeon at the Augusta State Medical Prison. (*Id.* at 7). Plaintiff alleges that the plastic surgeon told Plaintiff that his face had healed irregularly because VSP waited too long to bring Plaintiff in for treatment. (*Id.*) Plaintiff contends that to fix his face, the surgeon told Plaintiff that he would have to rebreak his face and that procedure presented a risk that Plaintiff would go blind. (*Id.*) Plaintiff further alleges that the surgeon told him that if Plaintiff had been brought in sooner, that the outcome would have been better. (*Id.*; *see also* Beal Dep. 34:1—14.)

## IV.   ANALYSIS OF MOODY'S MSJ

### A.  Dr. Moody's MSJ

During the times relevant to the Plaintiff's allegations, Dr. Moody was the Medical Director at VSP (Doc. 316-2 at 2-5) ("Declaration"). As Medical Director, Dr. Moody is responsible for supervising the daily medical care of inmates housed at VSP. (*Id.* ¶ 4.) If an inmate needs medical care that cannot be provided within VSP, Dr. Moody is required to prepare and submit a consultation request to the Utilization Management ("UM") division of the Georgia Department of Corrections ("GDC"). (*Id.* ¶ 5.) The decision of whether to approve or deny the requested services lies exclusively with UM. (*Id.* ¶ 6.) While Dr. Moody oversees an inmate's medical treatment within VSP, he does not schedule appointments for an inmate to receive medical care outside of VSP. (*Id.* ¶ 7.) Dr. Moody has treated Plaintiff during the time he has been incarcerated at VSP, and Dr. Moody is familiar with Plaintiff's medical records maintained by the GDC and VSP attached to his Declaration. (*Id.* ¶ 8.) On review of the medical records, the Court notes that they include the medical reports from outside providers, such as SGEP, that have treated Plaintiff during the times relevant to Plaintiff's claims against Dr. Moody.

Dr. Moody contends that he is entitled to summary judgment as to Plaintiff's deliberate indifference to a serious medical need claim. As reflected above, to successfully oppose Moody's MSJ, Plaintiff must satisfy both an objective and a subjective inquiry. *Farrow*, 320 F.3d at 1243. Plaintiff must first "set forth evidence of an objectively serious medical need,"

and must also "prove that [Dr. Moody] acted with an attitude of 'deliberate indifference' to that serious medical need." (*Id.*) Moody does not contend that Plaintiff failed to meet the objectively serious medical need element. However, Dr. Moody contends that Plaintiff has not shown that Dr. Moody acted with deliberate indifference by disregarding any potential risk to Plaintiff with respect to Dr. Moody's treatment of Plaintiff's injuries, and in particular treatment of Plaintiff's left eye. *Dunn v. Martin*, 178 F. App'x 876, 877 (11th Cir. 2006) (per curiam).

### 1. Dr. Moody's Declaration, Statement of Undisputed Facts and Medical Records

Dr. Moody provided a Statement of Undisputed Material Facts (Doc. 316-3 ¶¶ 14-43) setting out a timeline of Plaintiff's injuries and treatments along with citations to Dr. Moody's Declaration and Plaintiff's medical records which is attached as Exhibit 1 to Dr. Moody's Declaration (Doc. 316-2). In reviewing the timeline and documents provided in support of Moody's MSJ, the Court notes multiple discrepancies in Dr. Moody's citations to the medical records. Dr. Moody asserts the following material facts are undisputed:

1. On March 14, 2019, Plaintiff was treated by medical staff at VSP for a swollen left eye from a fight that occurred two days prior. *See* Moody Decl. ¶ 10. Dr. Moody referred Plaintiff to a local ophthalmologist and their recommendation was for a facial CT scan, and that Dr. Moody follow up with Plaintiff. *See* Moody Decl. ¶ 10.

2. However, on April 2, 2019, Plaintiff refused the CT scan that was recommended by the local ophthalmologist. *See* Moody Decl. ¶ 11, Ex. 1 at 89.

The Court notes that Ex. 1 at 89 is a refusal of treatment for an ophthalmology consult dated December 12, 2019—not a refusal for a CT scan scheduled for April 2, 2019. However, as reflected below, Plaintiff's refusal dated April 2, 2019, is at Doc. 316-2 at 95 and is discussed, *infra*, Part IV.B.2.a.

3. On April 22, 2019, Plaintiff was involved in an altercation at VSP and received further injuries to his left eye. *See* Moody Decl. ¶ 12; *see also* Beal Dep. at 31.

4. Plaintiff was sent to the emergency room by Dr. Moody, where a CT scan showed left orbit floor fracture with protrusion of left orbital fat and possible injury to the left inferior rectus. *See* Moody Decl. ¶ 12, Ex. 1 at 128. It is unknown whether this injury occurred after the March 14, 2019 injury or the April 22, 2019 injury due to Plaintiff's refusal of the CT scan on April 2, 2019. *See* Moody Decl. ¶ 12.

Exhibit 1 at 128 is a GDC Consultation Request dated June 4, 2019, and is not related to a CT scan.

5.      On April 23, 2019, Dr. Moody recommended Plaintiff to be seen by a local ophthalmologist and requested a plastic surgeon consultation for Plaintiff. *See* Moody Decl. ¶ 13, Ex. 1 at 77, 125; see also Beal Dep. at 33. On April 24, 2019, Plaintiff was again seen by the local ophthalmologist, who recommended that Plaintiff be seen by a retinal specialist. *See* Moody Decl. ¶ 14.

Exhibit 1 at 77 is an acknowledgment of receipt by Plaintiff of a pair of glasses dated November 8, 2019, and Ex. 1 at 125 is a GDC Consultation Request for an ophthalmologist consult dated September 18, 2019, resubmitted December 13, 2019. Neither of the referenced documents relates to a consult for Plaintiff to see an ophthalmologist on April 24, 2019.

Dr. Moody did not include in his authenticated medical records the ophthalmologist's report dated April 24, 2019.

6.      Plaintiff was seen by the retinal specialist on May 29, 2019. *See* Moody Decl. ¶ 14, Ex. 1 at 133-134. The retinal specialist found no evidence of retinal pathology and referred Plaintiff back to general ophthalmology. *See* Moody Decl. ¶ 14, Ex. 1 at 133-134.

The records at Ex. 1 at 133-34 do not reflect that Plaintiff was seen by a retinal specialist on May 29, 2019. Nor do those documents reflect the findings of a retinal specialist. Exhibit 1 at 133  is a GDC Consultation Request dated March 14, 2019, requesting follow up with Dr. Norman and CT results. Exhibit 1 at 134 is a GDC Consultation Request that appears to be the request for ER services for Plaintiff dated April 22, 2019.

7.      On May 15, 2019, Plaintiff was seen by the plastic surgeon for the orbital fracture. *See* Moody Decl. ¶ 15, Ex. 1 at 125. Plaintiff complained that he could not see out of his eye and that it was hurting. *See* Beal Dep. at 36; *see also* Moody Decl. ¶ 15, Ex. 1 at 125. The plastic surgeon consult recommended that Plaintiff see ophthalmology again because he was in pain and return in two weeks. *See* Moody Decl. ¶ 15, Ex. 1 at 125. The plastic surgeon found no evidence of retinal pathology for Plaintiff. *See* Moody Decl. ¶ 15, Ex. 1 at 125.

Again, the referenced medical reports are not as described. Exhibit 1 at 125 is not related to a May 15, 2019 appointment with a plastic surgeon nor does it indicate that a plastic surgeon found no evidence of retinal pathology for Plaintiff. Rather, the report is a GDC Consultation Request dated September 18, 2019, resubmitted December 13, 2019, relating to ophthalmology services for Plaintiff. It appears to reference a February 2019 incident although Plaintiff's complaints include visual disturbances and a crack in his eyeball.

8.      On June 17, 2019, Plaintiff was seen at VSP where he complained of hoarseness from his throat being compressed in an altercation on April 24, 2019. *See* Moody Decl. ¶ 16, Ex. 1 at 121. Plaintiff was referred to an ENT and saw the ENT on July 22, 2019. *See* Moody Decl. ¶ 16, Ex. 1 at 121. Plaintiff's vocal cords had normal movement and there was no sign of trauma. *See* Moody Decl. ¶ 16, Ex. 1 at 121. Plaintiff was released with instructions to follow up as needed. *See* Moody Decl. ¶ 16, Ex. 1 at 121.

Exhibit 1 at 121 is a GDC Segregation Record Review and Flow Sheet reflecting that Plaintiff was admitted to segregation on March 16, 2019. There is no reference to the above matters.

9.      On June 19, 2019, Plaintiff was seen by the plastic surgeon again and was released to follow up as needed. *See* Moody Decl. ¶ 17

Dr. Moody has not provided a copy of the June 19, 2019 report from the plastic surgeon.

10.     On July 18, 2019, Plaintiff was seen by local ophthalmology. *See* Beal Dep. at 38; *see also* Moody Decl. ¶ 18, Ex. 1 at 75. Plaintiff was found to have no visually threatening ocular pathology. *See* Moody Decl. ¶ 18, Ex. 1 at 29, 75. Plaintiff was released with instructions to follow up as needed. *See* Moody Decl. ¶ 18, Ex. 1 at 29, 75.

Exhibit 1 at 29 is a GDC Progress Record (Medical-Dental) reflecting that Plaintiff was seen on October 7, 2019, for injuries that appear to relate to the October 4, 2019 attack—which is not related to the allegations against Dr. Moody. Exhibit 1 at 75 relates to a radiograph of Plaintiff's chest taken March 27, 2019, and reports that Plaintiff has "No acute cardiopulmonary disease." Neither documents references the July 18, 2019 visit to an ophthalmologist.

11.     On July 30, 2019, Plaintiff reported visual problems and Dr. Moody referred him back to ophthalmology. *See* Moody Decl. ¶ 19, Ex. 1 at 29, 35, 120.

As reflected in the comments to paragraph 10 above, Ex. 1 at 29 is unrelated to allegations against Dr. Moody. Exhibit 1 at 35 appears to be a summary from Dr. Moody and merely restates the above assertion. Also as stated above, Ex. 1 at 121 is a GDC Segregation Record Review and Flow Sheet reflecting that Plaintiff was admitted to segregation on March 16, 2019. Thus, these documents do not relate to the statements in the above paragraph.

12.     On August 8, 2019, ophthalmology made significant efforts to reassure Plaintiff and explain his symptoms to him. *See* Moody Decl., ¶ 20, Ex. 1 at 74. Despite

the finding the Plaintiff's eyes are very healthy, he continued to complain of visual problems. *See* Moody Decl. ¶ 20, Ex. 1 at 74.

Exhibit 1 at 74 is not a report dated August 8, 2019, from an ophthalmologist. Rather it is a Radiology Report regarding images of Plaintiff's facial bones taken October 9, 2019. The findings state that there is "no evidence of an acute fracture. The orbits are symmetric and intact."

13.     On August 19, 2019, Dr. Moody followed up with Plaintiff and also attempted to reassure him. *See* Moody Decl. ¶ 21, Ex. 1 at 28. Dr. Moody explained that Plaintiff has had positive reports from five different ophthalmologist visits, including the retinal specialist. *See* Moody Decl. ¶ 21, Ex. 1 at 28. Dr. Moody explained that Plaintiff's eyes or face may never really feel the same again post trauma. *See* Moody Decl. ¶ 21, Ex. 1 at 28. Dr. Moody advised that there is enough reassuring information in Plaintiff's chart that he should try to not be so anxious about the situation. *See* Moody Decl. ¶ 21, Ex. 1 at 28. Dr. Moody asked Plaintiff to keep a headache diary and return when he has four to six weeks of entries so that it can be determined if there might be a migraine variant that could be addressed. *See* Moody Decl. ¶ 21, Ex. 1 at 28.

Exhibit 1 at 28 is a GDC Medical Encounter Form dated October 15, 2019, which appears to be a follow up for a physician to discuss Plaintiff's X-rays.

At Plaintiff's deposition, he was asked to read almost verbatim (absent the citations to the Declaration and medical records) a substantial portion of Dr. Moody's "Statement of Undisputed Material Facts." (Beal Depo. 43:5—46:20.) While Plaintiff agreed that the summary "shows a sign of timeline" of his medical history, Plaintiff stated "it also shows a sign of – of bluntly lies. They say my eyes – they say my eyes are healthy. I got documents from the doctor that they're not healthy." (*Id.* 46:17—20.) Plaintiff, however, failed to provide the documents to which he refers.

### B. Plaintiff's Objection to Recommendation

#### 1. Dr. Moody's Failure to Provide Medical Records

Plaintiff alleges that Dr. Moody did not provide Plaintiff with a copy of the medical records attached to Moody's MSJ. (Doc. 349 at 16.) Plaintiff contends that he is being prejudiced and denied his due process rights by Dr. Moody's failure to provide the medical records because Plaintiff has the burden to establish his claims. Plaintiff further asserts he needs the medical records to establish that Dr. Moody's delay in providing treatment resulted in a high risk that Plaintiff will go blind from subsequent treatment. (*Id.* at 16-17.) As Plaintiff

states himself, his claims against Dr. Moody are not that Dr. Moody did not provide care, but that he did not provide the recommended care quickly enough. (*Id.* at 16.) Plaintiff having grasped the significance of his burden, argues that

> [F]ailure of plaintiff to place his own verifying medical evidence into the record is particularly relevant because [Plaintiff] alleges that Dr. Moody's delay in treatment resulted in an alleged high risk that [Plaintiff] will go blind from subsequent treatment. Its [sic] Plaintiff's burden to place medical evidence in the record. Hill, 40 F.3d at 1188. And Moody's failure to comply with Fed. R. Civ. Pro. [sic] and not produce it to Plaintiff will cause manifest injustice.

(*Id.* at 17.) Plaintiff is correct that he has the burden of proof. *Hill v. DeKalb RYDC*, 40 F.3d 1176, 1188 (11th Cir. 1994) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

Plaintiff essentially asserts that because of Dr. Moody's alleged failure to provide him with copies of his medical records, that Plaintiff should be excused from providing verified medical records to support his allegations. Plaintiff made a similar complaint in his Response to MSJ (Doc. 324 at 1). Therein, Plaintiff alleged that at the time he needed to respond to Moody's MSJ, he had not received a copy of Moody's MSJ, "nor his declaration and material facts and/or any other materials concerning [the] content thereof." (*Id.*) Plaintiff asserted that he was, therefore, unable to reply to Dr. Moody's statement of facts or summary judgment stating: "Therefore, Plaintiff will be making this response with a blind eye." (*Id.*)

By Notices of Summary Judgment Motion (Docs. 317 and 318), Plaintiff was advised that two motions for summary judgment had been filed in his case on June 29, 2022, and that his responses thereto were due within thirty days of service of the motions. Plaintiff was aware of the deadline for filing responses and is accustomed to requesting extensions of time when necessary. Yet, the docket does not reflect that he filed a request for extension because he had not received a copy of Moody's MSJ—which is obviously good cause for such an extension. The record is also void as to any effort he otherwise made to notify the Court that he had not received a copy of Moody's MSJ. Plaintiff has a right to represent himself, but he alone is responsible for developing his strategy and managing his case. He made the decision to file his "response with a blind eye." *See Butler v. Broward Cnty. Cent. Examining Bd.*, 367 Fed. App'x.

991, 992 (11th Cir. 2010) ("Courts are not allowed to act as de facto counsel or to rewrite a deficient pleading."); *Swain v. Col. Tech. Univ.*, No. CV414-071, 2014 WL 3012693, at *1 (S.D. Ga. June 12, 2014) ("Judges . . . at most can construe liberally what pro se litigants say factually, but they cannot develop legal arguments or plug the legal holes in their cases for them.").

The Court long ago advised Plaintiff that the Court will not conduct discovery for Plaintiff. (*See* Order entered August 13, 2020 (Doc. 123).) The Defendants were not the only parties from whom Plaintiff could request copies of his medical records. The various ophthalmologists and physicians have copies of their own records. Further, on August 7, 2019, Plaintiff signed a GDC Consent to Request or Release Medical Information so he could obtain copies of his medical records including "[p]rogress notes/consults/ophthal [r]eport" for his personal use. (Doc. 316-2 at 92.) Plaintiff requested 34 pages at .25 each for a total charge of $8.50. Obviously Plaintiff knows how to request his medical records, and his attachment of the SGEP March 14, 2019 and April 24, 2019 Reports to documents he has filed in this case reflects he has successfully obtained medical records. *See* discussion, *infra*, Part IV.B.2. Finally, the Court has already reconsidered Judge Langstaff's orders denying Plaintiff's late filed motions to compel Defendants, including Dr. Moody, to produce discovery. (See Order Doc. 360). The Court declines to revisit that issue, but incorporates its Order herein by reference.

The Plaintiff is not excused from his burden of establishing that Dr. Moody's alleged delay in providing recommended treatments exacerbated Plaintiff's injuries sustained in the March 13, 2019 and April 22, 2019 attacks.

### 2. Support Provided by Plaintiff in Opposition to Moody's MSJ

In his Response to MSJ, Plaintiff reiterates the two specific instances in which he contends Dr. Moody acted with deliberate indifference: (1) by failing to timely schedule the CT scan and failing to schedule a follow up visit as recommended by Dr. Norman during Plaintiff's March 14, 2019 appointment, and (2) by failing to schedule an appointment with a plastic surgeon per Dr. Webster's recommended treatment during Plaintiff's April 24, 2019 appointment. (Doc. 324-1 at 12-13.) Plaintiff asserts that by delaying these treatments, Dr. Moody put Plaintiff at risk and caused him to suffer additional injury and the possibility of blindness. (*Id.* at 16-17.) In support of his assertion, Plaintiff cites to Doc. 70, Exhibits I through N. (*Id.* at 16.) Exhibits I through N are the SGEP March 14, 2019 and April 24, 2019

Reports. (Doc. 70-13 at 8-13).[9] The SGEP March 14, 2019 Report is also included in the medical records authenticated by Dr. Moody. (See Decl. ¶ 8, Doc. 316-2 at 135-37.)

Plaintiff confirms in his deposition that he has seen five to six eye specialists including four ophthalmologists and a retinal specialist. (Beal Depo. 35:9—10; 38:1—4.) There is also no dispute that Plaintiff saw a plastic surgeon on May 15, 2019.

      a)  <u>March 13, 2019 Attack</u>

The SGEP March 14, 2019 Report reflects that Plaintiff was seen by Dr. Norman. As a result of the attack on March 13, 2019, Dr. Norman noted under "Impression" a "Commotio retinae of left eye—New[;] Traumatic periorbital ecchymosis of the left eye—New[;] Traumatic subconjunctival hemorrhage of right eye—New[; and] Non-traumatic subconjunctival hemorrhage of left eye—New[.]" (Doc. 70-13 at 9) The report further reflects that Dr. Norman recommended a "maxillofacial w/o contrast ct scan OS" and a "F/U with Webster in 1 week[.]" (*Id.*) The "Plan" notations reflect that Dr. Norman "discussed risk of R/D," and that the patient understands to return immediately if changes are noted and that he "keep all f/u care." (*Id.* at 9.)

Plaintiff's Response to MSJ includes a list of documents relied on in support of his arguments.[10] Included in those documents is an undated letter from Victoria Nobles of SGEP explaining, in general terms, the medical conditions "Commotio retinae," "periorbital ecchymosis," and "hemorrhage." While the Court "may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial." *The Lamar Co., L.L.C. v. City of Marietta, Ga.*, 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008), Ms. Nobles' letter is not dated and does not include a specific prognosis of these conditions with respect to Plaintiff's injuries. Nor does it address the severity of Plaintiff's particular injuries. Thus, the Court views the letter as irrelevant, even if authenticated, to the matter before the Court.

---

[9] Document 70 is Plaintiff's response to a motion to dismiss filed by several of the defendants in these cases. In his Response to MSJ, Plaintiff refers to Document 70, Attachment #14. (Doc. 324 at 16.) However, Exhibits I through N are Attachment #13.

[10] Plaintiff includes Document 19 in the list of documents relied upon in support of his Response to MSJ. (Doc. 324 at 2.) Document 19 includes exhibits to Plaintiff's recast complaint in *Beal I* (Doc. 5).

Plaintiff has not provided a layman's explanation from Dr. Norman or other medical expert as to how the above medical conditions affect the Plaintiff. As to any damage to Plaintiff's vision, the Court notes only that this medical report indicates Plaintiff had uncorrected eyesight of 20/20 in his right eye and 20/25 in his left eye on the date of the exam. (Doc. 70-13 at 8.) The Court further notes that while Dr. Norman's report reflects that Plaintiff's injuries were "severe," the report does not indicate any urgency in scheduling the recommended CT scan. (*Id.*) Attached to the medical records authenticated by Dr. Moody are two GDC Consultation Requests dated March 14, 2019, both with time notations of "12p." One of the requests is to allow an "urgent facial CT as rec. by Dr. Norman @ [SGEP]" (Doc. 316-2 at 143)  The second request is to allow a two week follow up with Dr. Norman with CT results (*Id.* at 133). These documents contradict Plaintiff's assertion that a CT scan and follow up appointment were not scheduled.

Dr. Moody's Declaration (Decl. ¶ 11) reflects that on April 2, 2019, Plaintiff refused a CT scan that had been scheduled for Plaintiff. Plaintiff denies he refused a CT scan on April 2, 2019 (Beal Depo. 43:25). Plaintiff states he does not remember an April 2nd appointment, and would not have refused the scan because his "eye was messy." (*Id.* at 44:8—10.) However, a Refusal of Treatment Against Medical Advice form signed by Plaintiff and dated April 2, 2019, shows that Plaintiff refused treatment for a CT scan. (Doc. 316-2 at 95.)

The record clearly shows that GDC Consultation Requests were completed for the appointments recommended by Dr. Norman. Evidently the appointment for the CT scan was approved, but Plaintiff refused the treatment. As to the follow up appointment, the record reflects that Dr. Moody does not have control over whether requests for medical service outside of VSP are approved. Plaintiff's claim with respect to the March 13, 2019 attack is based on allegations that Dr. Moody acted with deliberate indifference by interfering with or delaying the treatment recommended by Dr. Norman, and that as a result of such delay, Plaintiff suffered serious injury. However, Plaintiff failed to present any admissible evidence to show that referrals were delayed, and any delay in treatment was the fault of Plaintiff.

As such, Plaintiff failed to make a sufficient showing on an essential element, on which he had the burden of proof, with respect to his claim related to the treatment Dr. Norman recommended for Plaintiff in the SGEP March 14, 2019 Report. There is no genuine dispute

of material fact as to whether Plaintiff has shown that he suffered a serious injury due to a delay in referrals or treatment by Dr. Moody. Therefore, Dr. Moody is entitled to judgment as a matter of law with respect to the allegations relating to the March 13, 2019 attack and Dr. Norman's recommendations contained in the SGEP March 14, 2019 Report.

      b)  <u>April 22, 2019 Attack</u>

The SGEP April 24, 2019 Report reflects that Plaintiff was seen by Dr Webster for the injuries Plaintiff sustained in the April 22, 2019 attack.[11] With respect to that attack, Dr. Webster noted the following under "Impression:" "Subretinal hemorrhage of left eye—New" and "Subconjunctival hemorrhage of left eye—New." (Doc. 70-13 at 12.) The report further reflects under "Plan" that the trauma was from two to three days prior to the visit and that Plaintiff was previously evaluated six weeks ago for another trauma. (*Id.*) Dr. Webster's notations and recommendations are:

> now with enophthalmos OS and shaffer positive OS
> - recommend Oculoplastics eval for orbital floor fracture OS
> - recommend Retina eval for shaffer positive and subretinal hemorrhage OS
> - no holes/tears seen on exam but given recent repeat trauam [sic] and exam change will refer to retina.

(*Id.* at 13.) Again, Plaintiff has not provided a layman's explanation from Dr. Webster or other medical expert to assist the Court in gleaning the severity, prognosis or effect of the above medical conditions. Over five weeks after the March 13, 2019 attack, the Court notes that Plaintiff had uncorrected eyesight of 20/20 in his right eye and 20/20 in his left eye on the date of the exam. (*Id.* at 12.) The Court further notes that while the report classifies Plaintiff's injuries as moderate-severe, the report does not indicate any urgency in scheduling the referral

---

[11] The Court finds it curious that the SGEP April 24, 2019 medical report is not included in the reports attached to Dr. Moody's Declaration—particularly, as the April 22, 2019 attack was severe and Plaintiff's allegations against Dr. Moody are directly related to the April 24, 2019 report. In any event, as previously noted, the Court "may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial." *Lamar Co., L.L.C.*, 538 F. Supp. 2d at 1377. *See also, Jacoby v. Keers*, 779 F. App'x 676, 679 (11th Cir. 2019) ("The district court did not abuse its discretion in holding that the defendants' [unauthenticated] exhibits can be considered at the summary judgment stage. When a Rule 56(c)(2) objection is made, it is within the district court's discretion to determine if the material used to support a fact can be presented in a form that would be admissible at trial."). As Plaintiff should be able to authenticate the SGEP April 24, 2019 medical report if trial is necessary, the Court exercises its discretion to consider such document in resolving Moody's MSJ.

for the "Oculoplastics eval" or provide a specific time frame in which the referral should be made. The "Plan" reflects that Plaintiff should return as needed. (*Id.* at 13.)

The Plaintiff asserts numerous times in his pleadings and deposition, that he was supposed to be referred to a plastic surgeon within two weeks of the April 24, 2019 appointment with Dr. Webster. However, Plaintiff has never cited to a doctor's report or provided any evidence that the referral to a plastic surgeon was required, or even recommended, to be scheduled within two-weeks of the initial appointment. Plaintiff has asserted numerous times that the plastic surgeon told him that his face had healed irregularly and that the surgeon would have to rebreak his face to fix it to realign his eyeball. However, Plaintiff has not provided one iota of evidence to corroborate this allegation. There is no admissible evidence that the plastic surgeon stated that Plaintiff ran the risk of going blind if he had the surgery necessary to fix his face. Plaintiff stated at his deposition that he *has* documents from doctors showing that his eyes are not healthy. (Beal Dep. 46:17—20.) He has not provided such documents. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."' *Matsushita*, 475 U.S. at 586 (citations omitted). Plaintiff is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Plaintiff continually repeating the same self-serving, uncorroborated allegations he made in the *Beal II* Complaint are insufficient at this stage of these cases, and do not create a genuine issue of material fact.

This Court agrees with Judge Langstaff that Plaintiff failed to meet his burden to place verifiable medical evidence in the record to establish the detrimental effect caused by a delay in Dr. Moody's referral of Plaintiff to a plastic surgeon. It is Plaintiff's burden to provide such medical evidence. The Court has further reviewed the medical records placed into evidence by Dr. Moody and that evidence does not show a detrimental effect of the alleged delay in treatment.

As such, Plaintiff failed to make a sufficient showing on an essential element, on which Plaintiff has the burden of proof, with respect to his claim related to the treatment Dr. Webster recommended for Plaintiff in the SGEP April 24, 2019 Report. There is no genuine dispute of material fact as to whether Plaintiff has shown that he suffered a serious injury due to a

delay in referrals or treatment by Dr. Moody. Therefore, Dr. Moody is entitled to judgment as a matter of law with respect to the allegations relating to the April 22, 2019 attack and Dr. Webster's recommendations contained in the SGEP April 24, 2019 Report.

### C. Qualified Immunity

Plaintiff has not filed any objections with respect to Judge Langstaff's finding that Dr. Moody is entitled to qualified immunity. Upon review, this Court finds no clear error with respect to Judge Langstaff's finding and recommendation.

## V. CONCLUSION

Upon full review and consideration of the record, the Court finds that Judge Langstaff's Recommendation (Doc. 329) should be, and hereby is, **ACCEPTED, ADOPTED**, and made the Order of this Court for the reasons stated, findings made, and conclusions reached therein, together with the reasons stated, findings made, and conclusions reached herein. Accordingly, Defendant Avery Moody's Motion for Summary Judgment (Doc. 316) is **GRANTED**. Plaintiff's Objection to the Order and Recommendation (Doc. 349) is **OVERRULED**. It is further **ORDERED AND ADJUDGED** that Plaintiff Christopher Beal shall take nothing by his complaint against Defendant Avery Moody and that judgment be entered in the Defendant Avery Moody's favor and against Plaintiff.

**SO ORDERED**, this 31st day of March 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**