# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

CHRISTOPHER BEAL,                          :
                                           :
      Plaintiff,                      :
                                           :
  v.                                      :          CASE NO:  7:19-cv-155 (WLS)
                                           :
JIMMY MILES, *et al.,*                     :
                                           :
      Defendants.                     :
_____    :

## <u>ORDER</u>

Before the Court is the Recommendation (Doc. 331) filed August 17, 2022, by United States Magistrate Judge Thomas Q. Langstaff recommending that the Court grant the Defendants Hillary Coleman and Jennifer Wolters's Motion for Summary Judgment (Doc. 315) ("Summary Judgment Motion"). Judge Langstaff's Recommendation provided the parties with fourteen days to file objections to the Recommendation. (Doc. 331 at 16.) By Order (Doc. 343) entered August 30, 2022, Plaintiff was given an additional fourteen days from the date of the Order, or until September 13, 2022, in which to file his objections to the Recommendation. Plaintiff's "Objections to the Court's Order and Recommendations in (Doc. 331)" (Doc. 348) ("Objection") was timely filed effective September 11, 2022.[1]

For the reasons that follow, Judge Langstaff's Recommendation filed August 17, 2022, (Doc. 33) is **ACCEPTED and ADOPTED**.

---

[1] Under the "prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing. Absent evidence to the contrary, we assume that the prisoner's filing was delivered to prison authorities the day he signed it." *Daker v. Comm'r, Georgia Dep't of Corr.*, 820 F.3d 1278, 1286 (11th Cir. 2016) (alteration adopted) (internal quotation marks omitted) (citations omitted). Plaintiff's Objection was signed by Plaintiff on September 11, 2022 (Doc. 348 at 20) and docketed September 16, 2022.

# I.   Procedural and Factual Background

On September 12, 2019, Plaintiff, proceeding *pro se*,[2] filed this action pursuant to 42 U.S.C. § 1983 ("*Beal I*"), alleging violations of his rights during the time he was an inmate at Valdosta State Prison ("VSP"). Plaintiff filed two additional cases in this Court: Case No. 7:20-CV-42, filed March 10, 2020, captioned *Beal v. Georgia Department of Corrections*, e*t al.*, (M.D. Ga.) ("*Beal II*"), and Case No. 7:20-CV-146 filed July 28, 2020, captioned *Beal v. Hall, et al.*, (M.D. Ga.) ("*Beal III*"). Several parties and substantial portions of the allegations in the three cases are duplicative and intertwined. Thus, the cases were consolidated to conserve judicial resources and allow for the efficient and consistent resolution of Plaintiff's claims.[3]

Plaintiff's allegations against Hillary Coleman ("Coleman") were first asserted in Plaintiff's verified "Supplemental Complaint" filed in *Beal I* (Doc. 32-1) ("Supplemental Complaint"). The Supplemental Complaint is attached to Plaintiff's motion to amend (Doc. 32). Judge Langstaff granted the motion allowing Plaintiff to join Coleman as a Defendant and allowing Plaintiff to amend his recast complaint (Doc. 5) to add a deliberate indifference to safety claim against Coleman. *See* Order (Doc. 34.) Therefore, references to Plaintiff's claims against Coleman are to the Supplemental Complaint.[4]

Plaintiff's allegations against Jennifer Wolters ("Wolters" and together with Coleman, "Movants") were first asserted in *Beal II* and are contained in Plaintiff's verified recast complaint (*Beal II* Doc. 14) ("*Beal II* Complaint"). In his initial review of the *Beal II* Complaint under 28 U.S.C. § 1915(a)(A), Judge Langstaff recommended allowing Plaintiff's claim for violations of his Eighth Amendment rights on a claim of deliberate indifference to safety against Wolters to proceed. (*See* Order & Recommendation (*Beal II* Doc. 18 at 11-12) (accepted and adopted by Order (*Beal II* Doc. 39).); *see also* Recommendation (Doc. 287) (resolving various motions, including motions to dismiss, and providing detailed procedural history of

---

[2] Because Plaintiff is proceeding *pro se*, his pleadings are liberally construed. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam).

[3] *See Beal II* Order entered January 27, 2021 (Doc. 39 accepting and adopting Recommendation (Doc. 18)); *Beal III* Order entered January 4, 2021 (Doc. 24, accepting and adopting Recommendation (Doc. 13)). *Beal I* is the lead case, and unless otherwise noted, document citations are to the docket in *Beal I*.

[4] The *Beal II* Complaint included duplicative claims against Coleman which were dismissed. (*See* Order and Recommendation (*Beal II* Doc. 18 at 13) (accepted and adopted by Order (*Beal II* Doc. 39).

consolidated cases and claims allowed to proceed against various defendants) (accepted and adopted by Order (Doc. 291).)[5] References to Plaintiff's claims against Wolters cite to the *Beal II* Complaint.

In these consolidated cases, Plaintiff bases his claims against the various defendants on five incidents that occurred while he was an inmate at VSP. Plaintiff's claims against Movants asserting that they acted with deliberate indifference to his safety arise from an incident that occurred on October 4, 2019, in which Plaintiff was attacked by his roommate and stabbed multiple times. (Supp. Compl. 2; *Beal II* Compl. 4-5.) Plaintiff alleges Movants acted with deliberate indifference after Plaintiff voiced concerns for his personal safety regarding death threats made to him by his roommate and that they failed to intervene and assist Plaintiff during an attack by such roommate. (Supp. Compl. 2-3; *Beal II* Compl. 4-5.) The October 4, 2019 attack is described in detail, *infra*, Part III.

## II.   STANDARD OF REVIEW

### A.  District Court's Review of Recommendation on Dispositive Motions

With respect to dispositive motions, "a [district] judge may . . . designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court. . . ." 28 U.S.C. § 636(b)(1)(B). A judge of the district court shall make a *de novo* determination of those portions of the recommendation to which an objection is made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. If no timely objection is filed, the court considers the recommendation for clear error. "Most circuits agree that in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Macort v. Prem, Inc.*,

---

[5] After entry of the Order (Doc. 291) accepting and adopting the Recommendation (Doc. 287), Plaintiff's claims against the following VSP employees were also allowed to proceed and are pending before the Court: (a) Captain Jimmy Miles for excessive force; (b) LeeAnna Smith, Unit Manager for failure to intervene and deliberate indifference to safety; (c) Mark Pack for excessive force; and (d) Sgt. Hunter Hall for excessive force. Plaintiff voluntarily dismissed his claim against VSP Cadet William Wilkerson for failure to intervene (see Order Doc. 361). Plaintiff's claims against Avery Moody, Medical Director of VSP, for deliberate indifference to a serious medical need and against Len Gibson, Deputy Warden of Administration of VSP, for deliberate indifference to safety, were resolved by entry of the Court's Orders (Docs. 364, 367, respectively) granting Moody's and Gibson's motions for summary judgment.

208 F. App'x 781, 784 (11th Cir. 2006) (alteration adopted) (internal quotation marks omitted) (citation omitted).

To properly object to the Recommendation, Plaintiff is required to provide "written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort*, 208 F. App'x at 783 (internal quotation marks omitted) (citation omitted). "It is critical that the objection be sufficiently specific and not a general objection to the report." *Id.* at 784. "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Shuler v. Okeechobee CI Warden*, 815 F. App'x 457, 458 (11th Cir. 2020) (internal quotations marks omitted) (citation omitted).

Plaintiff states general objections to Judge Langstaff's findings that Plaintiff failed to meet his burden of showing a substantial risk of serious harm and that the Movants were aware of such risk. Plaintiff further objects to Judge Langstaff's findings that the Movants took reasonable steps to abate the harm and that they are both entitled to qualified immunity. (Doc. 348 at 1.) To the extent Plaintiff provides specificity and substance to his objections, they are addressed below.

### B. Motion for Summary Judgment Standard

Under Fed. R. Civ. P. 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.'" *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by citing to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The movant can meet that burden by presenting evidence showing there is no dispute of material fact, or by demonstrating that the nonmoving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted).

Also relevant in this case, is that the *Beal II* Complaint and the Supplemental Complaint are verified, and, therefore, "serve[ ] as the equivalent of an affidavit for purposes of summary judgment." *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (citation omitted). *See also United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc) ("[O]ur cases correctly explain that a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment."). The "affidavit cannot be conclusory" and "must set out facts that would be admissible in evidence." *Id.* at 856-57. Thus, to the extent Plaintiff's statements and allegations are based on personal knowledge or observation, are otherwise admissible

evidence, and are not conclusory in nature, they are appropriate for the Court's consideration in resolving the Summary Judgment Motion.

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Matsushita*, 475 U.S. at 587-88; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### C.  42 U.S.C. § 1983

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII; *McBride v. Rivers*, 170 F. App'x 648, 654 (11th Cir. 2006); *see also Robinson v. California*, 370 U.S. 660, 675 (1962) (holding that the Eighth Amendment's ban on cruel and unusual punishments is made applicable to the states by virtue of the Fourteenth Amendment's Due Process Clause).

To state a claim for relief under § 1983, a plaintiff must allege that (1) an act or omission deprived him of a right, privilege, or immunity secured by the Constitution or a statute of the United States; and (2) the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). If a litigant cannot satisfy these requirements or fails to provide factual allegations in support of his claim or claims, the complaint is subject to dismissal. *See Chappell v. Rich,* 340 F.3d 1279, 1282–84 (11th Cir. 2003).

Plaintiff claims that Movants were deliberately indifferent to his safety. Pursuant to the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration adopted) (internal quotation marks omitted) (citation omitted); *see also id.* ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); *Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir. 1994) ("[W]hile the Constitution does not require prisons to be comfortable, it also does not permit them to be inhumane, and it is now settled that the

6

conditions under which a prisoner is confined are subject to scrutiny under the Eighth Amendment." (alterations adopted) (internal quotation marks omitted) (citation omitted)).

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. The law recognizes that "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." *Purcell ex rel. Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1323 (11th Cir. 2005) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)). Put another way, "to prove a claim of deliberate indifference in violation of the Eighth Amendment, the plaintiff must show that: (1) there was substantial risk of serious harm (the objective component); (2) the defendants acted with deliberate indifference to that risk (the subjective component); and (3) the defendants' wrongful conduct caused the injury." *Staley v. Owens*, 367 F. App'x 102, 107 (11th Cir. 2010) (per curiam) (citing *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (per curiam)). To show that a prison official was deliberately indifferent, a plaintiff must first show the prison official knew that plaintiff faced a substantial risk of serious harm. *Farmer*, 511 U.S. at 838, 847. The Supreme Court further stated that:

> Because . . . prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to *the officials to prove* that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. *Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.*
>
> *In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.* A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Farmer*, 511 U.S. at 844–45 (emphasis added) (internal quotation marks omitted) (citations omitted). In *Staley*, the Eleventh Circuit appears to interpret the above language as placing the initial burden on Plaintiff to establish that Coleman or Wolters had actual knowledge of the substantial risk of serious harm to Plaintiff, with the burden then shifting to the Movants to

7

*show* they responded reasonably to the risk, even if the harm ultimately was not averted. The Circuit stated:

> Nevertheless, *a defendant may avoid liability by showing* that: (1) he was unaware of the underlying facts indicating a substantial risk; (2) he "believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) he "responded reasonably to the risk, even if the harm ultimately was not averted." [*Farmer*, 511 U.S.] at 844, 114 S. Ct. at 1982–83.

*Staley*, 367 F. App'x at 107 (emphasis added). In cases where the contention is that the official unreasonably failed to prevent the attack, the cases instruct further that, in determining subjective knowledge, a court is to inquire whether the defendant was aware of a "particularized threat or fear felt by [the plaintiff]." *Carter*, 352 F.3d at 1350; *accord Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990).

### D. Qualified Immunity

Movants assert they are entitled to the protection of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* There are two parts to the qualified immunity analysis: (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct. *Id.* at 232.

The Eleventh Circuit has held that:

> To be eligible for qualified immunity, the official must first establish that he was performing a discretionary function at the time the alleged violation of federal law occurred. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the

> constitutional right the defendant violated was clearly established at the time he
> did it.

*Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (internal quotation marks omitted) (citations omitted). Thus, in the Eleventh Circuit, the Court first determines whether Coleman or Wolters were engaged in a discretionary function before moving on to determine whether Plaintiff has presented relevant facts that either committed a constitutional violation and that violation was clearly established at the time of Coleman's or Wolters' conduct. "To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities." *Id* at 1332 (internal quotations marks omitted) (citation omitted).

## III.   PLAINTIFF'S ALLEGATIONS

As indicated above, the October 4, 2019 attack is relevant to Plaintiff's allegations against Movants. Plaintiff alleges that on October 3, 2019, Plaintiff was housed in B-1 Dormitory when inmate Brandon Thomas ("Thomas") was moved into Plaintiff's cell. (Supp. Compl. 2.) Plaintiff states he asked Thomas "about his sexuality because he was acting feminine, and acting very strange in a way that made plaintiff feel too uncomfortable and unsafe." (*Id.*)

On October 4, 2019, Plaintiff asserts that Thomas was in the cell when Plaintiff entered and saw Thomas with two jail-made knives (or shanks) in his hands which scared Plaintiff so he walked back out of the cell. (*Id.*) Plaintiff asserts that later that night, Thomas told Plaintiff that he was going to rape and kill Plaintiff that same night. (*Id.*) While Plaintiff was in the television floor area of the dorm, Thomas approached Plaintiff holding the shanks and again told Plaintiff he was going to rape and kill Plaintiff that night. (*Id.*) Plaintiff asserts that he "went immediately and advised Defendant Coleman about the situation when she came in the dorm for nightly head count. During count Plaintiff advised Defendant Coleman of the entire situation that he felt 'threatened and unsafe.' She told Plaintiff in response, 'I will talk to you after count.'" (*Id.*) Plaintiff states he also told Wolters that he was at risk of harm from his cellmate, that his cellmate threatened to rape and kill Plaintiff later that night, and that Plaintiff needed protection. (Supp. Compl. 2; *Beal II* Compl. 5.)

9

After count, Coleman brought Plaintiff into the sally port[6] of the B building. (Supp. Compl. 2.) Plaintiff explained to Coleman that his roommate said he was going to rape and kill Plaintiff, and Plaintiff again stated that he felt unsafe. (*Id.*) Coleman asked, "what do you want me to do?" (*Id.*) Plaintiff suggested that she call the supervisor and let them know of the situation as Plaintiff was still recovering from the injury sustained to his eye in a previous inmate altercation. (*Id.* at 2-3.) Plaintiff asserts Coleman stated: "Oh I know Brandon Thomas. He's crazy, isn't he Level 3, what is he doing up here?" (*Id.* at 3.) Plaintiff responded, "I don't know, but I'm not going back in there with him." (*Id.*)

After he and Coleman finished their discussion, Plaintiff asserts Thomas was standing at the dormitory door with an evil look on his face. (*Id.*) Plaintiff asserts Coleman also noticed this look as she walked inside the officer's control booth. (*Id.*) According to Plaintiff, although Coleman and Wolters knew Thomas was waiting at the door, Coleman told Wolters to "pop B-1." (Supp. Compl. 3; *Beal II* Compl. 5.) As soon as the door opened, Thomas approached Plaintiff with a knife in each hand. (Supp. Compl. 3.) The door to B-1 Dormitory closed behind Thomas, and Plaintiff and Thomas were both locked in the sally port. (*Id.*) Plaintiff yelled for the door to be opened. (*Id.*) Seconds later, Plaintiff was stabbed. (*Id.*) Plaintiff, as well as fellow inmates, screamed for Coleman and/or Wolters to open the door, but Coleman and Wolters allegedly did nothing but watch the attack. (Supp. Compl. 3; *Beal II* Compl. 5.) Plaintiff was stabbed for over five minutes before officers came to his aid, which prompted Coleman to open the door. (Supp. Compl. 3; *Beal II* Compl. 5.) The Plaintiff was stabbed fourteen times in his head, neck, arms and leg. (Supp. Compl. 4; *Beal II* Compl. 5.) The Plaintiff was taken to the medical unit at VSP and placed in an infirmary cell. He was not taken for treatment outside of VSP. (Supp. Compl. 4.) Plaintiff asked the unit manager to take pictures of his wounds, but she refused. (*Id.*)

---

[6] A "sally port" is "a secure entryway (as at a prison) that consists of a series of doors or gates." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/sally%20port (Last visited Apr. 6, 2023).

IV. **EVIDENCE**

**A. Plaintiff's Deposition**

Plaintiff's deposition was taken on April 28, 2022 ("Beal Deposition").[7] Plaintiff testified that on October 3, 2019, Plaintiff was housed in B-1 housing unit and inmate Thomas was moved into Plaintiff's cell. (Beal Depo. 59:16.) On October 4, 2019, Plaintiff asked Thomas about his sexual orientation at which time Thomas snapped at Plaintiff, called him the "N" word, pulled out two knives, and told Plaintiff he was going to rape and kill Plaintiff later that night.[8] (Beal Depo. 59:17—21.) Plaintiff took Thomas seriously and during the night count Plaintiff told Coleman he needed to talk to her about his safety. (*Id.* 59:21—60:3.) Coleman told Plaintiff she would talk to him after she completed the inmate count. After Coleman left to do the count, Plaintiff went to the officer's control room to tell Wolters about his concerns because she had known Plaintiff for about two years. (*Id.* 60:10—14.) Plaintiff told Wolters that he and his bunk mate were not getting along and that his bunk mate just threatened to rape and kill Plaintiff that night. (*Id.* 60:15—16.) According to Plaintiff, Wolters' response was to ask Plaintiff what he wanted her to do about the situation, he asked Wolters to call the supervisor, and she wrote down his request. (*Id.* 60:18—21.)

Plaintiff stated that right after he talked to Wolters, Coleman took him into the sally port, and Plaintiff told her that his bunk mate threatened to rape and kill him. According to Plaintiff, Coleman knew Thomas, asked what he was doing in that dorm and stated that Thomas was crazy. (*Id.* 61:7—14.) Plaintiff testified that Thomas was standing at the door, looking evil, when Coleman went into the control booth and had the door to B-1 Dormitory opened. (*Id.* 61:15—18.) Thomas then came into the sally port, attacked Plaintiff with the two

---

[7] A copy of the deposition is attached as Exhibit A to the Summary Judgment Motion (Doc. 315-1). The page numbers in the citations to Beal's Deposition are the deposition page number rather than the CM/ECF page numbers of Exhibit A.

[8] Plaintiff's Deposition testimony, while not truly inconsistent with the allegations in the Supplemental Complaint and *Beal II* Complaint, varies as to Thomas' reaction to Plaintiff's question regarding Thomas' sexuality and as to whether Thomas told Plaintiff a second time that he was going to rape and kill Plaintiff while they were in the television floor area of the dormitory. The Deposition testimony also varies as to whether Wolters or Coleman asked Plaintiff what he wanted them to do about the situation with Thomas. While noting these variances, the Court recognizes that depositions can be stressful and as a *pro se* party, Plaintiff was without counsel to assist in clarifying or completing Plaintiff's testimony. The Court finds these variances immaterial.

shanks, stabbing him fourteen times. (*Id.* 61:19—25; 64:9—19.) Plaintiff states he was stabbed in the head, throat, and leg. (*Id.* 62:1—9.)

### B. Coleman's Declaration

The Declaration of Hillary Coleman (Doc. 315-2) ("Coleman Declaration") is provided in support of the Summary Judgment Motion. During the times relevant to Plaintiff's allegations, Coleman was a Corrections Officer at VSP, she is familiar with Plaintiff, and was the floor officer on October 4, 2019. (Coleman Decl. ¶¶ 2, 3, 13.)

Coleman states that on October 4, 2019, while she was conducting an inmate count of the B-l Dormitory, Plaintiff approached her and told her he needed to talk to her about his safety. (*Id.* ¶ 4.) Coleman responded that she would talk to him after she completed the count. (*Id.* ¶ 5.) After the count was completed, Coleman pulled Plaintiff into the sally port and he told her he was concerned for his safety because his cellmate, Thomas, threatened to rape and kill him. (*Id.* ¶¶ 6, 7.) As Thomas had previously threatened other inmates, Coleman believed that the threats toward Plaintiff could be genuine. (*Id.* ¶ 8.) Coleman told Plaintiff that she would go back into the control room to call a supervisor and see if she could get either Plaintiff or Thomas moved. (*Id.* ¶ 9.) Coleman states that she asked Plaintiff if he was okay leaving the sally port and going back into the B-1 Dormitory while she made the call to the supervisor, and Plaintiff stated he was fine with going back into the dorm. (*Id.* ¶ 10.) The sally port is the only entrance to the dormitory, and generally it cannot be used as a holding place for inmates because of the need to keep that point of access open for movement of other inmates, prison security officers, and other staff. (*Id.* at 2 n.1.) Coleman denies she told Plaintiff that Thomas was crazy; rather, she said she knew Thomas and thought that Plaintiff might be telling the truth. (*Id.* ¶ 12.)[9]

Wolters was the control room officer during the October 4, 2019 attack, and Coleman told Wolters to "pop the door connecting the sally port to the dorm," which Wolters did. (*Id.* ¶¶ 13, 14.) Coleman went inside the control room with Wolters to make the call regarding the situation between Plaintiff and Thomas. (*Id.* ¶ 15.) Coleman asserts Thomas was in the day

---

[9] Coleman did not deny that she questioned why Thomas was in that dormitory or on the floor as Plaintiff alleges.

room in the dormitory, but was not near the door to the sally port. (*Id.* ¶ 16.) When the door opened, Thomas began walking towards the door, and then rushed towards Plaintiff, pushing Plaintiff back into the sally port, at which time both Plaintiff and Thomas were in the sally port. (*Id.* ¶17.)  Coleman did not see anything in Thomas' hands at that time, but as soon as she saw Thomas push Plaintiff through the door, Coleman called a code 1018 for officers to assist with the attack. Once Thomas and Plaintiff were in the sally port, Coleman saw Thomas with a knife (*Id.* ¶¶ 18-21.) Coleman was not armed with any offensive or defensive weapons. (*Id.* ¶ 22.) Once the backup officers arrived approximately two to five minutes later, they opened the sally port door and instructed the inmates to stop fighting. (*Id.* ¶¶ 24, 25.) Thomas refused to stop, so the officers sprayed "OC spray" after which the door[10] was opened. (*Id.* ¶¶ 25, 26.) Coleman was unable to observe anything further because of the effects of the OC spray. (*Id.* ¶ 27.)

### C. Wolters' Declaration

The Declaration of Jennifer Wolters (Doc. 315-3) ("Wolters Declaration") is also provided in support of the Summary Judgment Motion. During the times relevant to Plaintiff's allegations, Wolters was a Corrections Officer at VSP, she is familiar with Plaintiff, and was the control room officer for the A and B dormitories on October 4, 2019. (Wolters Decl. ¶¶ 2-4.)

Wolters states that on October 4, 2019, while Coleman was conducting an inmate count of the A and B dormitories, Plaintiff approached Wolters and told her that his new cellmate had threatened to rape and kill him that night, and Plaintiff was worried about his ability to protect himself with his current eye injury. (*Id.* ¶¶ 4, 6, 7.) However, at that time, Plaintiff did not know his new cellmate's name, and he did not want to point the cellmate out where other inmates could see him doing so. (*Id.* ¶¶ 8, 9.) Wolters told Plaintiff to get with the floor officer, Coleman, when she was done with the count of A and B dormitories, and she would let a lieutenant know about the issue. (*Id.* ¶ 10.) Wolters states that at no point did she ask Plaintiff "What you want me to do?" about the situation with his cellmate. (*Id.* ¶ 11.)

---

[10] Coleman states the backup officers opened the sallyport door when they arrived, so it is unclear what door Coleman is referring to here, unless she means the door to the B-1 Dormitory.

Once the count was completed, Wolters could see Plaintiff speaking with Coleman in the sally port area. (*Id.* ¶ 12.) After Plaintiff and Coleman's conversation, Coleman told Wolters to pop the door to the B-1 Dormitory, and then Coleman entered the control room. (*Id.* ¶ 13.) Wolters states Plaintiff went through the sally port door to the B-1 Dormitory when she opened the door lock. (*Id.* ¶ 14.) She then saw Thomas rush towards Plaintiff and push him back through the door to the sally port as it was closing, trapping Plaintiff and Thomas in the sally port. (*Id.* ¶¶ 15, 16.)

Wolters saw Thomas had a shank in his hand and he began to attack Plaintiff. Coleman and Wolters commanded Thomas to put down the shank but he did not comply and continued to attack Plaintiff. (*Id.* ¶¶ 17, 18.) Wolters called on her radio for a code 1018, which means all available officers are needed for assistance. She also called for a code three, meaning that a weapon was being used by an inmate. (*Id.* ¶¶ 19, 20.) Wolters was not armed with any offensive or defensive weapons in the control room. (*Id.* ¶ 21.) Wolters agrees with Coleman that it took two to five minutes for the backup officers to respond to the attack. (*Id.* ¶ 22.)

Wolters states she could hear Plaintiff asking her to open the sally port so that he could attempt to escape. However, due to the code three being called for a weapon being used by an inmate, Wolters was required to keep the area contained for the safety of officers, staff, and other inmates until backup officers arrived to respond to the threat. For this security reason, and even though Thomas was assaulting Plaintiff, Wolters could not open the sally port until responding officers arrived. (*Id.* ¶ 23.) After the backup officers arrived, Wolters opened the sally port to allow the officers access to Thomas and Plaintiff. (*Id.* ¶ 24.) Thomas ignored the officers instructions to stop his attack on Plaintiff, and the officers used pepper spray in the sally port to subdue Thomas. (*Id.* ¶ 25.)

### D. Summary of Evidence for Summary Judgment Purposes

The facts in this matter are spread throughout multiple pleadings and documents.[11] To assist the Court in considering the Summary Judgment Motion, the Court summarizes all

---

[11] Including, the Supplemental Complaint, *Beal II* Complaint, Plaintiff's Deposition, Coleman's Declaration, and Wolters' Declaration.

relevant evidence and factual inferences drawn therefrom in the light most favorable to the Plaintiff. *See Matsushita,* 475 U.S. at 587-88; *Allen*, 121 F.3d at 646.

On October 3, 2019, Thomas, a new cellmate, was moved into Plaintiff's cell.

On October 4, 2019, while in their cell, Plaintiff asked Thomas about his sexuality which made Thomas angry. Thomas had two shanks and threated to rape and kill Plaintiff later that night. Plaintiff left the cell. During the night inmate count, Plaintiff told Coleman, the floor officer, that he wanted to talk to her about his safety. Coleman told Plaintiff she would talk to him when she completed the inmate count.

In the meantime, Plaintiff went to Wolters, who was in the officer's control booth and told her that his new cellmate had threatened to rape and kill him. The Plaintiff did not tell Wolters the name of his new cellmate.

Coleman completed the inmate count and took Plaintiff into the sally port. Plaintiff told her Thomas was his new cellmate. That Plaintiff had asked Thomas about his sexuality and the question made Thomas angry. Plaintiff told Coleman that Thomas had threated to rape and kill him later that night. Plaintiff further told Coleman that he was afraid. Coleman was familiar with Thomas and knew that he had threatened other inmates. Coleman believed Plaintiff's statements were likely true and she was going to contact a supervisor to have Plaintiff and Thomas separated that evening. Although Plaintiff states he told Coleman about the entire situation with Thomas, he has not specifically alleged that he told Coleman or Wolters that Thomas had the two shanks when he threatened to rape and kill Plaintiff.

When Plaintiff told her of Thomas' threat, Coleman questioned why Thomas was housed on the same floor as Plaintiff and whether Thomas was "a Level three" inmate.[12] Plaintiff replied to Coleman's questions that he did not know Thomas' status but that he was not going back into the B-1 Dormitory with Thomas.[13] Plaintiff testified that while he was in the sally port, Thomas was standing at the door, looking evil, and that Plaintiff saw Thomas

---

[12] Plaintiff also asserts that Coleman stated that Thomas was "crazy." Coleman denies that she made such statement. (Coleman Decl. ¶ 12.) The Court finds the characterization immaterial.

[13] Coleman's version of the facts here also differs from Plaintiff's. Coleman states that Plaintiff indicated he was fine with going back into the dorm while she contacted her supervisor. (Coleman Decl. ¶ 10.) A reasonable inference can be drawn that Plaintiff would not have been fine with going back into an area where he was afraid Thomas was waiting to kill him and had the ability to do so with the two shanks.

with the knives while Plaintiff was in the sally port. (Beal Depo. 62:10—20.) Coleman went into the control booth and had Wolters open the door to B-1 Dormitory. Thomas then came into the sally port, attacked Plaintiff with the two shanks, stabbing him fourteen times. Plaintiff and inmates in the B-1 Dormitory yelled at Movants to reopen the door. Neither Movant reopened the door, but both called in the code for assistance from backup officers and Wolters called in a code to alert the backup officers that Thomas had weapons. The Movants were unarmed. VSP protocol requires them to keep the area contained for the safety of officers, staff, and other inmates until backup officers arrive to respond to the threat. The backup officers arrived between two to five minutes and used pepper spray to subdue Thomas and stop the attack.

## V.   ANALYSIS OF DEFENDANTS COLEMAN AND WOLTERS' MOTION FOR SUMMARY JUDGMENT

### A.  Summary Judgment Motion

Movants contend they are entitled to summary judgment because they did not violate Plaintiff's Eighth Amendment rights. They further contend they are entitled to qualified immunity. To successfully oppose the Summary Judgment Motion, Plaintiff must identify by admissible evidence "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. According to Eleventh Circuit precedent,[14] to prove a case against Coleman and/or Wolters for deliberate indifference to his safety Plaintiff must satisfy the following elements:

1.      There was a substantial risk of serious harm to Plaintiff (the objective component);

2.      That Coleman and/or Wolters were deliberately indifferent to such risk (the subjective component). For this element, Plaintiff has the initial burden to establish that Coleman or Wolters had actual knowledge of the substantial risk of serious harm to Plaintiff,

---

[14] *See, e.g., Carter*, 352 F.3d at 1350. *See also Farmer*, 511 U.S. at 847.

with the burden then shifting to the Movants to *show* they responded reasonably to the risk, even if the harm ultimately was not averted. *Staley*, 367 F. App'x at 107.[15]

3.      That Coleman's and/or Wolters' wrongful conduct caused Plaintiff's injury.

In their brief in support of the Summary Judgment Motion, Movants focus entirely on the question of whether they failed to take reasonable measures to abate the substantial risk of serious harm to Plaintiff. Movants did not address the objective component of whether there was a substantial risk of serious harm to Plaintiff. Neither do they address whether either or both of them were personally aware that Plaintiff faced a substantial risk of serious harm.[16] Further, Movants do not address the causation element.

To be entitled to summary judgment, Movants need only demonstrate that Plaintiff failed to present evidence in support of one element of his case on which he bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. As addressed below, the Court agrees with Judge Langstaff that Coleman's and Wolters' decisions to keep the sally port door closed during the attack was reasonable under the circumstances.

However, while Movants may have acted reasonably during the attack, they have not addressed Plaintiff's arguments that Movants did not act reasonably in opening the door between Plaintiff and Thomas in the first place so that the attack should never have been allowed to start. (Doc. 348 at 13.)

### B.  Plaintiff failed to show that he faced a substantial risk of serious harm (the objective element).

As noted above, the Movants did not address this issue. Judge Langstaff recommended finding that Plaintiff has not shown that he faced a substantial risk of serious harm. The Court agrees with Judge Langstaff that when viewing all evidence and reasonable inferences in the light most favorable to Plaintiff, the Plaintiff did not meet the objective element to show that he faced a substantial risk of serious harm.

---

[15] Movants may also avoid liability by showing they were unaware of the underlying facts indicating a substantial risk or they believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. *Staley*, 367 Fed. App'x at 107.

[16] The Court notes that these elements are necessary precursors to Movants' asserted defense that they reasonably responded to abate the substantial risk of serious harm to Plaintiff. As such the Court addresses such elements in considering the Movants' arguments that they acted reasonably and within their discretion, and the Court does so upon the record for those reasons only.

Here, it is undisputed that on October 4, 2019, Plaintiff told the Movants that: Plaintiff had asked his cellmate, Thomas, about his sexuality, that the question made Thomas angry, that Thomas threatened to rape and murder Plaintiff later that night. However, Plaintiff has not shown that he told Coleman or Wolters that Thomas threatened Plaintiff while Thomas was holding two shanks. This information is critical to establish the serious nature and urgency of dealing with Thomas' threat. Plaintiff's assertions he "advised Defendant Coleman of the entire situation" (Supp. Compl. 2), is insufficient to allow the Court to draw an inference in Plaintiff's favor that he told Coleman or anyone else that Thomas had the shanks.

The Court finds that Plaintiff failed to make a sufficient showing on the essential element that Plaintiff faced a substantial risk of serious harm based on Thomas' threats.

**C. Whether a genuine dispute of a material fact exists as to whether Movants acted with deliberate indifference to Plaintiff's safety (subjective element).**

Neither Movant addresses the issue of whether she was personally aware that Plaintiff faced a substantial risk of serious harm. The Court considers the admissible evidence on this issue separately as to each Movant.

**1. Coleman.**

**a) Did Coleman Actually Know Plaintiff Faced a Substantial Risk of Serious Harm?**

In the Eleventh Circuit, a plaintiff must provide much more than vague, general statements of a risk of harm to establish that prison officials were subjectively aware of a substantial risk of serious harm. For instance, in *Carter*, the prison officials were aware that the inmate who attacked plaintiff was a "problem inmate," prone to violence, and had a history of disobedience. 352 F.3d at 1349. Further, plaintiff told the officials that the inmate acted crazy, roamed his cell like a "caged animal," planned to fake his own hanging, and that the inmate told the plaintiff that plaintiff would help inmate with his fake hanging—"one way or another." *Id.* On these facts, the Eleventh Circuit found plaintiff failed to show the officials were actually aware of a substantial risk of serious harm to plaintiff because he never told the officials that he feared the inmate. The Eleventh Circuit found that the statement "one way or another" did "not provide a sufficient basis for officials to make the inferential leap that a

18

substantial risk of serious harm to plaintiff existed." *Id.* at 1349-50. *See also Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019) (prison officials were not deliberately indifferent to substantial risk of serious harm where plaintiff's requests to be transferred were based on allegations of a general lack of safety in cell block and on a friend telling plaintiff that an unnamed inmate intended to hurt plaintiff).

In *Rodriguez v. Secretary for the Department of Corrections*, 508 F.3d 611 (11th Cir. 2007), the plaintiff was segregated from the general prison population because of an ongoing investigation of gang activities at the prison and because he had assaulted another inmate. 508 F.3d at 613-14. While segregated, plaintiff told two prison officials, Kugler and Johnson, that members of his former gang, the Latin Kings, were sending him messages and had shouted to plaintiff that they were going to kill him. *Id.* at 614. The Latin Kings had a large presence at the prison, and plaintiff told the officials that he was in fear for his life because the gang members wanted to kill him for renouncing his membership in the gang and for trying to get out of the gang. *Id.* 614, 621. Rather than being released back into the general population, the Plaintiff requested to be put in protective custody or transferred to another prison. *Id.* at 614. A review meeting was held to determine whether plaintiff was ready to be released from segregation and back into general population. Although the officials had other alternatives available to them, at the meeting the officials recommended plaintiff be put back into general population. *Id.* at 615-16. Within hours of his transfer, he was violently assaulted and stabbed in the back and chest with a shank. *Id.* at 613, 616.

The district court granted Kugler's motion for summary judgment finding that plaintiff's statements to Kugler failed to provide specific facts to show that Kugler was subjectively aware of the risk to plaintiff. *Id.* at 613. At trial, the district court, finding that Johnson did not cause the Eighth Amendment violation because Johnson did not have final authority to order plaintiff's release back into general population, granted Johnson's motion for judgment as a matter of law. *Id.*

On appeal, the Eleventh Circuit found that plaintiff had presented evidence from which a reasonable jury could find that Kugler had actual knowledge that plaintiff faced a

substantial risk of serious harm from his former gang members.[17] *Id.* at 618. That evidence was in the form of plaintiff's declaration that he had personally informed Kugler on at least two occasions and by an Inmate Request form that plaintiff was in fear for his life because of threats from his former gang. *Id.* at 618-19. The Eleventh Circuit reversed and remanded the district court's order granting summary judgment to Kugler. *Id.*

In considering whether Coleman was aware that Plaintiff faced a substantial risk of serious harm from Thomas' threats at the time she had the door to the sally port opened, the Court finds that this case is more similar to *Marbury* and *Carter* and is distinguishable from *Rodriguez*. It is undisputed that Coleman knew Thomas and knew he had made threats to other inmates. However, there are no allegations or evidence in the record that Thomas had committed violent acts against other inmates. More significant, however, is that there is no evidence that Coleman was aware that Thomas then had the means to carry out his threat; *i.e.*, that Thomas then had in his possession two shanks. Coleman did not know of the "particularized threat." *Carter*, 352 F.3d at 1350. Although Plaintiff told Coleman he was afraid, the record does not reflect that he gave her the most important "underlying fact[; i.e., that Thomas had two shanks] indicating a sufficiently substantial danger and that [Coleman was] therefore unaware of a danger." *Farmer*, 511 U.S. at 844.

Coleman's concern on whether Thomas was housed in the correct dormitory or level, together with the statements in her declaration shows that she believed Plaintiff's statements were likely true and she was going to contact a supervisor to have Plaintiff and Thomas separated that evening. However, "there must be much more than mere awareness of [an inmate's] generally problematic nature. Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists—and the prison official must also 'draw that inference.'" *Carter*, 352 F.3d at 1349 (quoting *Farmer*, 511 U.S. at 837). There is nothing in the record that shows Coleman had any reason to believe that Thomas' threats

---

[17] In *Rodriguez*, the district court had not considered the reasonableness of the prison officials' response to the known risk of harm to the plaintiff. Thus, the Eleventh Circuit did not address the reasonableness issue directly, but remanded the case on that, as well as other issues.

were not of the same nature as he had previously made to other inmates which had not resulted in any violent actions by him on the threatened inmates.

Thus, the Court finds that Plaintiff failed to establish the essential element that Coleman had a subjective awareness of a substantial risk of serious harm to Plaintiff in the critical relevant circumstances.

### b) Did Coleman Respond Reasonably to the Known Risk? And Did Coleman Cause Plaintiff's Injuries?

Plaintiff contends that Coleman failed to protect him when she told Wolters to open the door between the B-1 Dormitory and the sally port which allowed Thomas to attack Plaintiff. "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (internal quotation marks omitted) (citations omitted).

The test for determining whether Coleman responded reasonably to the risk facing Plaintiff are substantially similar to those for determining whether the official caused an inmates injuries. In analyzing whether a prison official caused an inmate's injury, the Eleventh Circuit instructs:

> For purposes of determining whether [the prison official] caused the Eighth Amendment violation and [inmate's] subsequent injury, the "critical" question is whether [the prison official] was in a position to take steps that could have averted the stabbing incident but, through deliberate indifference, failed to do so. To determine whether [the prison official] caused [the inmate's] injury, we look at his duties, discretion and means.
>
> Applying the concept of causation spelled out [above], we [have held] that a *plaintiff demonstrates the necessary causal link in this context where he is able to show that the prison official (1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded.*

*Rodriguez*, 508 F.3d at 622–23 (alterations adopted) (emphasis added) (internal quotation marks omitted) (citations omitted).

Taking the facts in the light most favorable to the Plaintiff: When Coleman finished the inmate count, she took Plaintiff into the sally port.[18] Coleman knew Plaintiff was afraid to go back into the B-1 Dormitory with Thomas. Coleman told Plaintiff she would contact her supervisor so either Thomas or Plaintiff could be moved to a different cell that night. Coleman intended to go to the control office immediately to call her supervisor. Thomas was standing at the sally port door with an evil look on his face. While Plaintiff states he saw Thomas with the two shanks while Plaintiff was in the sally port, Plaintiff does not indicate that he told Coleman. Coleman had Wolters open the door. Coleman did not see that Thomas had a knife until he was locked in the sally port with Plaintiff. (Coleman Decl. ¶¶ 18-21.) Coleman states in her Declaration that the sally port is the only entrance to the dormitory and generally[19] it cannot be used as a holding place for inmates because of the need to keep that access available for the movement of other inmates, prison security officers, and staff. (Coleman Dec. ¶ 19.)

On these facts, the Court agrees with Judge Langstaff that Coleman's response to the risk was reasonable. She took Plaintiff's statements about Thomas's threats seriously and was going to assist him promptly. There is no evidence in the record that Coleman had authority to leave Plaintiff in the sally port unattended while she went to make the call to her supervisor. Nor is there evidence that she could have made the call from the sally port or that Coleman had any other method to protect Plaintiff from Thomas.[20] Further there is no evidence in the record on which Coleman could have known that the attack was imminent. The fact that the attack occurred immediately upon the opening of the sally port door is not determinative of the reasonableness of Coleman's actions. Hindsight plays no part in the Court's review of alleged violations of the Eight Amendment. *Purcell*, 400 F.3d at 1320 ("We will not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment.").

---

[18] Plaintiff has not asserted it was unreasonable for Coleman to wait until after she finished the inmate count to talk to him about his safety concerns.

[19] Coleman's use of the phrase "generally" might infer that there are exceptions to the general rule. However, Plaintiff did not provide admissible evidence to rebut the reasonableness of Coleman's actions.

[20] In an obvious attempt to fill in missing allegations and evidence, Plaintiff asserts in his Objection that Coleman "knew of ways to reduce and/or prevent the harm [to Plaintiff] but knowingly failed to act . . . ." (Doc. 348 at 15.) However, Plaintiff's new allegations are conclusory and he has not provided any admissible evidence to support his statements.

The Court also agrees with Judge Langstaff that Coleman acted reasonably by not reopening the sally port door during the attack. The evidence reflects that Coleman and Wolters both called for backup officers without delay. Movants were both unarmed, Thomas was armed with two shanks, and protocol at VSP required them to keep the area contained for the safety of officers, staff, and other inmates until backup officers arrived to respond to the threat. (Doc. 315-5, Part B.1.)

Finally, applying the factors spelled out by the Eleventh Circuit in *Rodriguez*, the Court also finds that that Plaintiff failed to demonstrate that Coleman caused his injuries either by opening the door to the B-1 Dormitory or by failing to reopen the door during the attack. As noted above, to make such showing, Plaintiff is required to show that Coleman had means to improve his safety other than going to make a call to her supervisor, that Coleman knew that returning Plaintiff to the B-1 Dormitory while she went to make the call was insufficient to protect Plaintiff, and that Coleman had other means available to her to protect Plaintiff, but she disregarded the alternative means. Plaintiff provides only conclusory statements that Coleman should not have told Wolters to open the sally port door, but provided no admissible evidence that Coleman had the authority to take any other action than she took at the time.

Plaintiff failed to make a sufficient showing on the essential element that Coleman knowing that Plaintiff was at substantial risk of serious harm by Thomas, failed to take reasonable measure to abate the risk to Plaintiff. Plaintiff has the ultimate burden of proof on this issue and failed to rebut Coleman's showing that she acted reasonably both before and during the October 4, 2019 attack on Plaintiff. Further, Plaintiff failed to make a sufficient showing that Coleman's actions caused Plaintiff's injuries.

Accordingly, the Court finds that upon the record, there is no genuine dispute of material fact as to whether Coleman acted reasonably in response to the threat to Plaintiff. As such, Plaintiff failed to establish his claim that Coleman was deliberately indifferent to his safety. Therefore, Hillary Coleman is entitled to judgment as a matter of law.

### 2. Wolters

#### a) Did Wolters Know Plaintiff Faced a Substantial Risk of Serious Harm?

Wolters states that at the time he talked to her, Plaintiff did not know his new cellmate's name, and Plaintiff did not want to point the cellmate out where other inmates could see him doing so. (Wolters Decl. ¶¶ 8 & 9.) The Plaintiff never alleges that he told Wolters the name of the cellmate who threatened to rape and kill him, or that Plaintiff otherwise identified such cellmate.[21] And most significantly, the record does not reflect, and Plaintiff has not specifically alleged, that he made Wolters aware that Thomas possessed two shanks with which to carry out his threats to kill Plaintiff. Wolters' statements are sufficient to satisfy her initial burden "by demonstrating that the [Plaintiff] has failed to present evidence in support of some element of [his] case on which [he] bears the ultimate burden of proof." *See Celotex*, 477 U.S. at 323-24. To support his claim of deliberate indifference to his safety, Plaintiff must show that Wolters was aware of a "particularized threat or fear felt by Plaintiff." *Carter*, 352 F.3d at 1350. The Court agrees with Judge Langstaff, that without the identifying information and without the information regarding the shanks, Wolters did not possess the necessary information to determine whether the threat to Plaintiff was genuine. Plaintiff failed to present evidence in support of the essential element that Wolters knew Plaintiff faced a substantial risk of serious harm. Accordingly, the Court finds that upon the record, there is no genuine dispute of material fact as to whether Wolters was subjectively aware of such risk to Plaintiff.

#### b) Did Wolters Respond Reasonably to the Known Risk?

Plaintiff contends that Wolters failed to use reasonable measures to protect him because Wolters popped the B-1 dormitory door allowing Thomas to enter the sally port armed with two shanks. He further asserts that Wolters was aware that Thomas was at the sally port door before it was opened. First, even assuming Thomas was at the sally port door, as discussed above, Plaintiff failed to establish that Wolters even knew who to look for as she

---

[21] Again, in an obvious attempt to fill in missing allegations and evidence, Plaintiff asserts for the first time in his Objection that he told Wolters that his cellmate's name was Brandon Thomas. (Doc. 348 at 16, 18.) Plaintiff's Objection is not verified and Plaintiff failed to present evidence that Wolters knew the name of Plaintiff's cellmate or that she had any information regarding Thomas' history in his response to the Summary Judgment Motion. Plaintiff's new allegations do not constitute admissible evidence.

did not know the identity of the inmate who threatened Plaintiff. Further, Plaintiff's allegation that Wolters knew Thomas is conclusory and is not admissible evidence.

With respect to allegations that Wolters acted unreasonably by not reopening the sally port door, the Court's reasonableness analysis and conclusions above with respect to Coleman, are fully applicable to Wolters. *See, supra*, discussion at 23.

The Court finds that Plaintiff failed to make a sufficient showing on the essential element that Wolters failed to take reasonable measure to abate the risk to Plaintiff. Plaintiff has the ultimate burden of proof on this issue and failed to rebut Wolters' showing that she acted reasonably both before and during the October 4, 2019 attack on Plaintiff.

Accordingly, the Court finds that upon the record, there is no genuine dispute of material fact as to whether Wolters acted reasonably in response to the threat to Plaintiff. As such, Plaintiff failed to establish his claim that Wolters was deliberately indifferent to his safety. Therefore, Jennifer Wolters is entitled to judgment as a matter of law.

### D. Qualified Immunity

Plaintiff objects to Judge Langstaff's recommendation that the Court find that Movants are entitled to qualified immunity because Plaintiff asserts "a constitutional violation did occur on the alleged date of the allegations on 10-4-2019." (Doc. 348 at 1.) "It is critical that the objection [to a recommendation] be sufficiently specific and not a general objection to the report." *Macort*, 208 F. App'x at 784. While *pro se* pleadings are liberally construed, *Shuler*, 815 F. App'x at 458, the Court cannot develop legal argument for Plaintiff. *See Butler v. Broward Cnty. Cent. Examining Bd.*, 367 F. App'x. 991, 992 (11th Cir. 2010) ("Courts are not allowed to act as de facto counsel or to rewrite a deficient pleading."); *Swain v. Col. Tech. Univ.*, No. CV414-071, 2014 WL 3012693, at *1 (S.D. Ga. June 12, 2014) ("Judges . . . at most can construe liberally what *pro se* litigants say factually, but they cannot develop legal arguments or plug the legal holes in their cases for them.").

Plaintiff has not provided any substance to his "objection" regarding qualified immunity, and the Court has already responded to his objections relating to Movants' alleged Eighth Amendment violations and determined that Movants are entitled to judgment as a matter of law. Upon review, the Court agrees with Judge Langstaff's finding that Movants are entitled to qualified immunity.

## VI.   CONCLUSION

Upon full review and consideration of the record, the Court finds that Judge Langstaff's Recommendation (Doc. 331) should be, and hereby is, **ACCEPTED**, **ADOPTED**, and made the Order of this Court for the reasons stated, findings made, and conclusions reached therein, together with the reasons stated, findings made, and conclusions reached herein. Accordingly, Defendants Hillary Coleman and Jennifer Wolters' Motion for Summary Judgment (Doc. 315) is **GRANTED.** Plaintiff's Objection (Doc. 348) is **OVERRULED**. It is further **ORDERED AND ADJUDGED** that Plaintiff Christopher Beal shall take nothing by his complaints against Defendants Hillary Coleman or Jennifer Wolters and judgment shall be entered in the Defendants Hillary Coleman's and Jennifer Wolters' favor and against Plaintiff.

**SO ORDERED**, this 24th day of April 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

26